**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE BANK OF NEW YORK MELLON, et al.** | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:08-CV-01703-RDP** |
| | } | |
| **JEFFERSON COUNTY, ALABAMA, et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

This matter is before the court on Plaintiffs' Emergency Motion for Appointment of a Receiver ("Plaintiffs' Receivership Motion"). (Doc. #8). For the reasons explained below, the court finds that: (1) Plaintiffs have made a sufficient factual showing that they are entitled to the remedy of a receiver; but (2) the Johnson Act prohibits the appointment of a receiver with the power to directly or indirectly affect rates; and (3) the court should abstain from appointing a receiver even with limited powers. The court is fully aware that this result may seem counterintuitive[1] – at least in light of its findings of fact herein. Nonetheless, it is convinced this is the legally correct outcome.

I.    **Procedural History**

On September 16, 2008, Plaintiffs, The Bank of New York Mellon ("BONY"), Financial Guaranty Insurance Company ("FGIC"), and Syncora Guarantee, Inc., f/k/a XL Capital Assurance Inc. ("Syncora"), filed this action against Defendants, Jefferson County, Alabama (the "County"),

---

[1]Perhaps the matter could be oversimplified by saying that Plaintiffs are entitled to prevail on the facts, but the County wins on the law.

Bettye Fine Collins, Bobby Humphryes, Jim Carns, George Bowman,[2] and Sheila Smoot.  (Doc. #1).

In their Complaint, Plaintiffs allege that the County has defaulted on certain contractual obligations

related to its borrowing of substantial sums of money.  Shortly after filing their Complaint, Plaintiffs

also filed an emergency motion asking the court to appoint a receiver over the County's Sewer

System (the "Sewer System").  (Doc. #8).  The parties have extensively briefed that issue and the

court has held two evidentiary hearings on Plaintiffs' Motion.  (*See e.g.*, Docs. #9, 11, 30-34, 36-37,

61, 72-76, 79-92).

As the court has consistently and repeatedly reminded the parties, this complex, divisive, and

heated controversy will not (and cannot) be satisfactorily resolved by way of any court order –

whether from this court or any other.  With this reality in mind, the court has, for the past eight

months, attempted to give the parties the time and resources to come to a resolution.  Unfortunately,

this controversy cannot be settled without the cooperation of third parties not before the court.  Even

more regrettably, those third parties – including the Alabama Legislature and the Jefferson County

Legislative Delegation – have not cooperated in seeking a solution to this crisis.  There are

undoubtedly a number of reasons for that.  One of the principal reasons would appear to be politics.[3]

Thus, despite the fact that the Special Masters – especially Judge John Ott – have made herculean

efforts in encouraging a consensual resolution of the financial crisis underlying this lawsuit, the

matter raised by Plaintiffs' motion is now under submission with this court.  At the last hearing,

Plaintiffs vigorously urged the court to stop efforts to foster a settlement and rule on their motion "up

---

[2]Upon Bowman leaving the Jefferson County Commission, and being replaced by William Bell, Bell was substituted for Bowman as a party.  *See* Order of November 14, 2008.

[3]As Ronald Reagan once quipped, "It has been said that politics is the second oldest profession. I have learned that it bears a striking resemblance to the first."

or down." The court is convinced of two things. First, that strategy is unwise because it abandons, at least temporarily, Plaintiffs' (particularly the Trustees') best avenue for resolving this matter. Second, notwithstanding the wisdom (or lack thereof) of their request, we have reached the point where Plaintiffs are entitled to a ruling on their motion.

## II.     **Findings of Fact**

The court makes the following findings of fact with respect to Plaintiffs' Receivership Motion. (Doc. #8).[4]

### A.     **The Issuance of Warrants and the Trust Indenture**

In connection with making required improvements to Defendant Jefferson County's Sewer System, between 1997 and 2003, the County borrowed approximately $3.6 billion in funds through the issuance of various sewer warrants ("Warrants"). The Warrants are secured by a lien on the revenues generated by the Sewer System that remain after payment of "Operating Expenses." There are approximately $3.2 billion in Warrants that remain outstanding.

The Trust Indenture is a document that was entered into by the County upon the issuance of Warrants and sets forth certain obligations of the issuer (the County) in favor of the purchasers of the Warrants. When Warrants are sold, the County essentially borrows money from the general public, the purchasers of the Warrants. The Trust Indenture is the contract that outlines the terms and conditions of the borrowing. The Indenture Trustee, one of the Plaintiffs in this action, is an independent institution that serves pursuant to the terms of the Trust Indenture. The Indenture

---

[4]To a large degree the court's findings are based upon the parties' most recent joint submission. (Doc. #71).

Trustee's function is to represent the holders of the Warrants and ensure that the issuer of the Warrants (*i.e.*, the County) lives up to its responsibilities, as set forth in the Indenture.

**B.**     **The County's Historical Approach to Revenue and Debt Service**

As early as 1997, the County understood that sewer rates would need to be raised in order to service the then-existing Warrant debt.  On February 12, 1997, the Jefferson County Commission approved an amendment (the "Rate Ordinance Resolution") to the County's Sewer Use/Pretreatment Ordinance dated May 11, 1982 (the "Rate Ordinance").  The Rate Ordinance Resolution authorized the County, in connection with the financing of the original sewer debt (and the February 1, 1997 Trust Indenture) to make a "Rate Covenant" designed to maintain net revenues sufficient to service the County's annual debt service on the Warrants.  The "Rate Covenant" in the Indenture provided for periodic, automatic rate increases in certain circumstances and was designed to ensure the County's ability to service its debt.

In 2002, Paul B. Krebs and Associates, Inc. ("Krebs"), an engineering firm, as was then its usual and annual practice for the County, analyzed potential sources of revenue for the County's Environmental Services Department ("ESD").  The ESD is the County Department responsible for operating the Sewer System. Krebs issued a report on March 31, 2003 (the "2003 Krebs Report") which concluded that the County required additional revenue to meets its debt obligations and that it should consider various options in addition to rate increases. Tellingly, this 2003 report stated that there can be "no debate about the urgency for action."

**C.**     **The County's Decision to Switch to Auction-Rate and Variable-Rate Financing**

In a risky attempt to minimize the interest rate costs to the County over the 40-year life span of the various Warrants, between 2001 and 2003 the County issued a substantial amount of variable-

rate demand Warrants and auction-rate Warrants, which took the place of the more conservative, traditional fixed-rate Warrants.  Two series of Warrants, the Series 2003-B and Series 2003-C Warrants, in an aggregate principal amount in excess of $2.2 billion, were issued subsequent to the County's receipt of the 2003 Krebs Report.  All but a small portion of the Series 2003-B and Series 2003-C Warrants bore interest at either a variable rate or an auction rate, subject to swap agreements that were sold to the County in an attempt to fix the rates synthetically.[5]  The 2003 Krebs Report, which concluded that the County required additional revenue to meet its then-existing debt obligations, was not attached to any official statement or public documents relating to the issuance of the Warrants.[6]

The debt at issue was primarily incurred to finance certain remediation projects required under a 1996 Consent Decree relating to the County's Sewer System.  The 1996 Consent Decree was entered into between the County and the United States Environmental Protection Agency to settle a lawsuit over violations of the Clean Water Act by the County's Sewer System.  The remediation work has been fraught with fraud and abuse.  Twenty-one former Jefferson County officials or contractors who worked on the Sewer System remediation projects have been indicted and/or convicted of federal crimes related to those projects.[7]  Some of these convictions were for bribery

---

[5]To be sure, the County originally borrowed (and was loaned) far too much money.  Even before the County refinanced the lower, fixed-rate Warrants, there is little question that it would not have been able to pay back the funds borrowed within the time period of the payment schedule.

[6]Further, the County entered into – and still has outstanding – thirteen separate interest rate swap agreements (the "Swap Agreements") with various financial institutions in a current aggregate notional amount of approximately $5.4 billion.

[7]At the March 26, 2009 receivership hearing, David Denard, the Director of the ESD, testified that he found himself in the position of Director over the ESD after everyone in authority over him had been convicted of crimes relating to these projects.

of public officials.  Three former County Commissioners have been convicted of crimes related to work on the Sewer System.  One former Commissioner has pled guilty to accepting bribes in connection with the Warrant transactions and the swap transactions at issue.  Another former Commissioner not only has been sued civilly by the Securities and Exchange Commission for allegedly accepting bribes in connection with these transactions, but also, along with two others involved in the transactions, has been indicted in connection with the alleged bribes.

### D.      The County's Purchase of Municipal Bond Insurance

Upon the issuance of the Warrants, the County purchased municipal bond insurance policies in an attempt to make the Warrants more marketable.  These policies were issued to the County by Plaintiffs Syncora and FGIC.[8]   At the time these policies were purchased, Syncora and FGIC were AAA rated insurers.  The interest rates on the variable-rate demand Warrants and auction-rate Warrants fluctuate based upon many factors, including the financial condition of the entities guaranteeing those Warrants.  The interest rates on the County's Warrants, other than its fixed-rate Warrants, have increased during 2008 for a variety of reasons, including the downgraded ratings of its bond insurers Syncora and FGIC.

### E.      The Relevant Terms of the Indenture

In the Indenture, the County made a number of promises to the purchasers of its Warrants, including the following:

Section 12.5, "Maintenance of Rates," provides as follows:

> (a) The County hereby covenants and agrees to fix, revise, and maintain such rates for services furnished by the System as shall be

---

[8]Non-party Financial Security Assurance ("FSA") insures approximately $352,000,000 in Warrants.

sufficient (i) to provide for the payment of the interest and premium (if any) on and the principal of the Parity Securities [Warrants], as and when the same become due and payable, (ii) to provide for the payment of the Operating Expenses and (iii) to enable the County to perform and comply with all of its covenants contained in the Indenture.

Section 13.1, "Events of Default Defined," defines certain Events of Default as follows:

(a) failure by the County to pay the principal of or the interest or premium (if any) on any Parity Security [Warrant] as and when the same become due as therein and herein provided (whether such shall become due at maturity or by redemption, acceleration or otherwise);

(b) failure by the County to satisfy the Rate Covenant, provided that any such failure shall not constitute an Event of Default if (i) the Trustee receives evidence satisfactory to it that an increase in the rates charged for services furnished by the System has occurred pursuant to the provisions of the ordinance of the County that governs such rates, or (ii) the County employs a utility system consultant to review the System and its existing rates and fees and makes a good faith effort to comply with the recommendation of such consultant;

(c) failure by the County to perform or observe any agreement, covenant, or condition required by the Indenture to be performed or observed by it [other than its agreement to pay the principal of and the interest and premium (if any) on the Parity Securities or the Rate Covenant] after thirty (30) days' written notice (which said notice must state that it is a notice of default hereunder) to it of such failure given by the Trustee or by the Holders of not less than twenty-five percent (25%) in aggregate principal amount of the Parity Securities then outstanding hereunder, unless during such period or any extension thereof the County has recommended and is diligently pursuing appropriate corrective action; ... .

In Section 13.2, "Remedies on Default," the County agreed that "upon the occurrence and

continuation of any Event of Default, the Trustee shall have the following rights and remedies,"

(a) Upon the occurrence and continuation of any Event of Default described in clause (a) of Section 13.1 hereof, the Trustee shall, and, upon the occurrence and continuation of any other Event of Default described in Section 13.2 hereof, the Trustee may, declare the Parity

7

Securities [Warrants] to be immediately due and payable, whereupon they shall, without further action, become and be immediately due and payable, anything in this Indenture or in the Parity Securities to the contrary notwithstanding.

(b) The Trustee may, by civil action, mandamus or other proceedings, protect, enforce and compel performance of all duties of the officials of the County, including the fixing of sufficient rates, the collection of revenues, the proper segregation of the revenues of the System and the proper application thereof and may, without limitation of the foregoing, proceed to protect and enforce its rights and the rights of the Parity Securityholders by a suit or suits, whether for the specific performance of any covenant or agreement herein contained or in execution of aid or any power granted herein or for the enforcement of any other proper, legal or equitable remedy, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce its rights and the rights of the Parity Securityholders hereunder.

(c) The Trustee shall be entitled upon or at any time after the commencement of any proceedings instituted with respect to an Event of Default, as a matter of strict right, upon the order of any court of competent jurisdiction, to the appointment of a receiver to administer and operate the System, with power to fix and charge rates and collect revenues sufficient to provide for the payment of the Parity Securities and any other obligations outstanding against the System or the revenues thereof and for the payment of expenses of operating and maintaining the System and with power to apply the income and revenues of the System in conformity with the Act and the Indenture.

Section 17.3 of the Indenture, "Miscellaneous Special Provisions Respecting the Bond Insurer and the Bond Insurance Policy," provides,

(a) In determining whether a payment default has occurred or whether a payment on the Series 1997-A Warrants or Series 1997-B Warrants has been made under the Indenture, no effect shall be given to payments made under the insurance policy.

8

F.    **The County's Failure to Make Payments and Receipt of Forbearance Agreements**

In April 2008, the County was unable to make certain required principal payments on the Warrants.  The County entered into forbearance agreements with various financial institutions ("Liquidity Banks") delaying the due date on these payments.  On or about June 2, 2008, the County made a principal redemption payment on the Warrants from its own funds in partial reduction of the April 1 Redemption Payment.  On or about August 1, 2008, the Liquidity Banks, the County, and the Bond Insurers entered into additional forbearance agreements.  In those agreements, the Liquidity Banks agreed to accept payments in the aggregate amount of approximately $79 million in payment of a portion of the April 1 Redemption Payment, a portion of the July 1 Redemption Payment, and certain interest that had previously been deferred, and also granted a forbearance until November 17, 2008.  On or about August 1, 2008, the County made a principal redemption payment on the Warrants from its own funds in the approximate amount of $44 million in partial reduction of the payments required by the August 1, 2008 forbearance agreements.

On or about August 29, 2008, the Liquidity Banks and the County entered into another forbearance agreement until September 30, 2008.  Neither FGIC nor Syncora entered into any forbearance agreement with the County after the termination of the August 1, 2008 forbearance agreements on August 29, 2008.

As a result of the County's failure to make certain payments due on the Warrants, the Indenture Trustee made claims on each of FGIC, Syncora, and FSA under their respective insurance policies.  Plaintiffs Syncora and FGIC have made substantial principal payments on the County's

Warrants which the County did not make when due pursuant to redemption notices respecting the Warrants.

The County failed to make payments of principal installments due on the Warrants (Parity Securities under the Indenture), called for redemption on June 1, 2008, August 1, 2008, and October 1, 2008, pursuant to the terms of the Indenture and certain Standby Warrant Purchase Agreements. Sewer System net revenues are not sufficient to service the County's current debt obligations. Further, the County has failed, pursuant to the Indenture, to fix, revise, and maintain rates that are sufficient to make required principal payments. The County has not raised sewer rates since January 2008, pursuant to the Rate Covenant or otherwise, despite the fact that Sewer System net revenues are not sufficient to service the Sewer System's current debt obligations.

Plaintiffs[9] initiated this action on September 16, 2009. In their Complaint, Plaintiffs assert the following claims: Count I - for the Appointment of a Receiver Pursuant to Indenture; Count II - for the Appointment of a Receiver Pursuant to Alabama Law; Count III - for Enforcement of Consent Decree; Count IV - for the Appointment of Interim Receiver; Count V - Mandamus (only against the Commissioners) (seeking compliance with the terms of the Indenture); Count VI - for Specific Performance of Obligations Under the Indenture; and Count VII - for Breach of Standby Warrant Purchase Agreements. (Doc. #1).

_____

[9]The County has argued that Syncora and FGIC lack standing to assert claims made in the Complaint. Regardless of whether the Insurers lack standing to bring this action, it is undisputed that The Bank of New York Mellon, as Indenture Trustee, does have standing and has asserted, on behalf of the Warrant holders, all the claims made against the County and the Commissioners.

III.   __Legal Analysis__

Shortly after filing their Complaint, on September 23, 2009, Plaintiffs filed an Emergency Motion for the Appointment of a Receiver over the Sewer System of Defendant Jefferson County, Alabama.   (Doc. #8).   After permitting discovery, conducting pre-hearing conferences, and permitting the parties time to seek a voluntary resolution of this controversy, on March 26, 2009, the court held an evidentiary hearing on the issue of whether Plaintiffs were entitled to the appointment of a receiver.   Just days before that hearing, for the first time, Defendants raised a number of issues with regard to whether this court has jurisdiction to hear this case and decide the issues raised in Plaintiffs' Emergency Motion for the Appointment of a Receiver.   All of these matters have now been fully briefed, and an additional evidentiary hearing was conducted on June 1, 2009.   (*See generally* Docs. #71-96).

A.   __The Remedy of Appointing a Receiver Over the Sewer System is Warranted by the Facts of This Case__

The appointment of a receiver over the Sewer System is a remedy that was agreed to by the County at the time it executed the Indenture, in the event it violated certain of its obligations under the Indenture.   The Eleventh Circuit has unequivocally stated that courts sitting in diversity should follow federal law in making the determination of whether to appoint a receiver.   *National Partnership Inv. Corp. v. National Housing Development Corp*., 153 F.3d 1289, 1291-92 (11th Cir. 1998) ("[F]ederal law governs the appointment of a receiver by a federal court exercising diversity jurisdiction.").   Moreover, federal courts have recognized in certain cases involving private sector entities that appointment of a receiver is appropriate where the parties have contractually agreed to a receivership.   *See, e.g., Britton v. Green*, 325 F.2d 377, 382 (10th Cir. 1963); *Garden Homes, Inc.*

11

*v. U.S.*, 207 F.2d 459, 460 (1st Cir. 1953); *American Bank and Trust Co. v. Bond Intern. Ltd.*, 2006 WL 2385309, *7 (N.D. Okla. 2006) ("Appointment of a receiver is appropriate where the parties have contractually agreed to a receivership."); *Pioneer Capital Corp. v. Environamics Corp.*, 2003 WL 345349, *9 (D. Me. 2003) (concluding that "the existence of an express contractual right to appointment of a receiver, coupled with 'adequate prima facie evidence of a default,' can be sufficient to warrant such an appointment"); *Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482, 499 (C.D. Cal. 1991) (finding that the appointment of a receiver pursuant to a Deed of Trust and Security Agreement was necessary to protect the plaintiff's interest).

Section 13.2 of the Indenture provides that the appointment of a receiver is a remedy available for "the occurrence and continuation of any Event of Default, ... ." Plaintiffs have alleged nine different types of Events of Default by the County:

1. Failure to pay principal on the Warrants when due on each of June 2, 2008, August 1, 2008, October 1, 2008, January 1, 2009, February 20, 2009, and April 1, 2009;

2. Failure to fix, revise, and maintain rates which are sufficient to pay debt service obligations, as required under § 12.5(a) of the Indenture;

3. Failure to make increases in rates and charges as necessary to comply with § 12.5(b) of the Indenture;

4. Failure to comply with the Rate Covenant set forth in § 12.5(b) of the Indenture;

5. Failure to deliver to the Trustee by December 10, 2008, notice of the County Finance Director's determinations and conclusions, as required under § 12.5(c) of the Indenture;

6. Failure to increase sewer rates on January 1, 2009, as required under § 12.5(c) of the Indenture;

7.    Failure to make required deposits into the Debt Service Fund, Reserve Fund, Rate Stabilization Fund, and Depreciation Fund, as required under § 11.1 of the Indenture;

8.    Failure to satisfy the Reserve Fund Requirement, as required under § 11.3 of the Indenture; and

9.    Failure to make required deposits into the Reserve Fund as a result of the Insurers' downgrades, as required by § 11.11 of the Indenture.

(Doc. #86 at 28; Doc. #89 at 16-44).

In issuing the Warrants and borrowing money from the general public, the County agreed that, upon the commencement of any proceedings instituted with respect to an Event of Default, that "as a matter of strict right, upon the order of any court of competent jurisdiction," the Trustee would be entitled "to the appointment of a receiver to *administer and operate* the System . . .."  Indenture Section 13.2(c) (emphasis added).

The evidence is overwhelming (if not undisputed) that the County has engaged in – and is continuing to engage in – Events of Default.  For example, it has not made certain required principal payments; it has failed to fix, revise, and maintain rates which are sufficient to pay its debt obligations; it has not complied with the Rate Covenant; it has failed to comply with the notice requirements under Section 12.5(c) of the Indenture; and it has failed to make payments into various funds as required under Section 11.1 of the Indenture.  Thus, the question here is not whether the County has defaulted, but whether the court should appoint a receiver as a remedy for those Events of Default.

"Courts have recognized many factors that are relevant for a court to consider when determining the appropriateness of the appointment of a receiver. These include fraudulent conduct on the part of the defendant, ...; imminent danger that property will be lost or squandered, ...; the

13

inadequacy of available legal remedies, ...; the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment, ...; the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property, ...; and whether the interests of the plaintiff and others sought to be protected will in fact be well served by the receivership, ... ." *Consolidated Rail Corporation v. Fore River Railway Co.*, 861 F.2d 322 (1st Cir.1988) (citations omitted); *see also Santibanez v. Wier McMahon & Co.*, 105 F.3d 234 (5th Cir.1997). Below, the court examines each of these factors in order, and also looks at the question of whether equitable principles counsel against enforcing this particular term of the Indenture.

1.   <u>Whether There Has Been Fraudulent Conduct on the Part of the Defendant</u>

Plaintiffs contend that there is at least an appearance of fraudulent conduct on the part of the County given what they describe as "massive corruption" surrounding the County's Sewer System construction and issuance of Warrants. They also assert that the County, since 2003, has suppressed information that would indicate that its sewer revenues were insufficient to meet its debt obligations. The court will discuss these assertions in turn.

To date, twenty-one former Jefferson County officials or contractors who worked on the Sewer System remediation projects have been indicted for federal crimes related to those projects. David Denard, the current Director of the ESD, testified at the March 26 hearing that he found himself in the Director position after everyone in a position of authority over him in the ESD had been convicted of crimes relating to these projects. Three former County Commissioners have been convicted of crimes related to the Sewer System. One former Commissioner has pled guilty to accepting bribes in connection with the re-financing of the Sewer System debt. Another former

14

Commissioner not only has been sued civilly by the Securities and Exchange Commission for allegedly accepting bribes in connection with such transactions, but also, along with two others involved in the transactions, has been indicted in connection with the alleged bribes.

Plaintiffs have also presented compelling evidence that the County has been aware, since at least March 2003 (if not before), that its net sewer revenues were insufficient to service its debt load. It was in March 2003 that the County received the 2003 Krebs Report.  Despite issuing additional Warrants later in 2003, it did not reveal this information to potential investors.  The County utilized the Krebs firm from 1997 to 2003 in order to evaluate the adequacy of sewer system rates and charges.  Prior to 2003, the reports issued by Krebs were generally optimistic about the County's ability to service the required debt payments from its sewer revenues; indeed, the County routinely attached these reports to its Official Statements for the various Warrant issuances to support the notion that net system revenues were adequate to meet its operating and debt service requirements.  However, the 2003 Krebs Report presented a much bleaker picture: it explicitly stated that the size of the sewer debt presented a major problem for the County, and warned that the County would need a dramatic 89% increase in sewer revenue to meet its future debt obligations.  Krebs recommended that the County take immediate action to raise additional system revenue, and warned that if it did not do so, the consequences would be severe.   As the 2003 Krebs Report stated:

> [W]hen the alternative of obtaining revenues through a plan over which the Commission has some control is compared with the action of a receiver should the system go into default, there can be little question as to which course of action would be preferable.  There can also [be] no debate about the urgency for action; this is not a matter on which action can be long deferred without serious consequences.

2003 Krebs Report.  Jt. Ex. 35.

Rather than heed this warning, the evidence before the court suggests that the County suppressed the 2003 Krebs Report and took little (if any) steps to generate the additional revenues which would be required to meet the looming sewer debt crisis.  Even worse, the County refinanced more than $2 billion of its fixed-rate Warrants to auction and variable-rate Warrants,[10] and in doing so did not disclose the existence of the 2003 Krebs Report to any of the Warrant purchasers.

Based on the foregoing, the court finds the record which is now before the court is replete with evidence of fraudulent conduct and suppression by the County and its various representatives.[11] Therefore, the evidence before the court on this factor weighs in favor of appointing a receiver.

> 2.    Whether There is an Imminent Danger that Property Will be Lost or Squandered

The County has frequently asserted, in this litigation and elsewhere, that the only recourse available to Plaintiffs and the Warrant holders is the net revenues of the Sewer System.  The evidence presented to the court indicates that the County has for years known that System revenues (the only recourse available) were insufficient to cover its obligations on this debt.  There is also evidence that, despite this knowledge, for years the County failed and/or refused to investigate whether sewer revenues were (1) maximized and (2) sufficient to cover the County's debt obligations related to the System. One member of the County Commission, whose responsibilities include overseeing the Sewer System, has not only refused to take action, but has openly advocated reducing

---

[10]The May 1, 2003 and August 5, 2003 Warrant issuances were projected to result in an average annual savings to the County of 15.1% for the first seven years.  Savings were projected to be negative for several years thereafter.  Obviously, these issuances fell far short of resolving the County's impending revenue shortfall.

[11]This is not to say that there is not evidence of fraudulent conduct by other parties. However, that information is not relevant to the current inquiry.

sewer rates, declaring bankruptcy,[12] and/or making payments from net sewer revenues that are insufficient to service the debt load.

Plaintiffs have presented evidence that the County has been wasting available System revenues for years.  The mismanagement is evidenced by the fact that the County has ignored the advice of consultants who since 2003 have warned the County that its financial condition was unsustainable.  For example, the court has already detailed the evidence relating to the County's ignoring (and suppressing) the Krebs Report.  But there is more.

The County's failure to address its crisis has developed into a pattern of inaction over the years.  In 2003, after receiving the Krebs Report, the County retained new advisors – the professional firm of BE&K, Inc. ("BE&K") – to study the problem.  BE&K issued a report advising that "sewer rates must be increased" beyond the automatic increases under the County's Rate Ordinance Resolution.  The report forecasted that the County's projected sewer rate increases would be insufficient to cover its debt obligations and that "a level 12.5-percent increase in 2004 through 2011 would meet needed revenue requirements and help stabilize rate increases." Jt. Ex. 37.  The County, however, did not raise rates in the manner recommended by BE&K.

In 2007, the County retained another professional firm, Red Oak Consulting ("Red Oak").  Red Oak issued a report advising the County that if the debt service costs became higher than initially projected, the County would need "significant" increases to its sewer rate revenues in order

---

[12]In fairness, at the June 1, 2009 evidentiary hearing, each of the Commissioners, including Commissioner Carns, indicated that they did not then believe bankruptcy to be a suitable option.  In response to inquiries from the court, they also each said they were willing to jointly agree to the retention of a consultant to examine whether rates are reasonable, and whether rates should be raised or reduced.  It was Plaintiffs who balked at this idea.

to service the debt.  The Red Oak report also recommended other revenue enhancements.  Again, none of these recommendations were adopted by the County.[13]

In the face of consistent input from rate experts that net sewer revenues were insufficient to operate and pay its debt obligations, the County went in the *opposite* direction.  It suspended the automatic rate increase that was due for 2009 under the County's automatic rate adjustment resolution.  Accordingly, even today, rates remain at the same level at which they were set on January 1, 2008.

The most recent example of the County's refusal to deal with its sewer debt crisis can be seen in the County's response to the Special Masters'[14] Report, dated January 20, 2009 and its snail-like pace in engaging yet *another* rate consultant.  The Special Masters' Report contains numerous substantive recommendations for increasing revenues and decreasing expenses.  Plaintiffs have presented evidence demonstrating that, at least since early 2008, the Commissioner in charge of the

_____

[13]In addition, in May 2008, counsel for FGIC and Syncora retained the professional firm R.W. Beck, Inc. ("R.W. Beck") to conduct an assessment of the System and to identify potential revenue enhancements and expense reductions, separate and apart from volumetric sewer rate increases, which could be implemented by the County to assist with meetings its debt obligations.  Darrell Cline of R.W. Beck issued a report (the "Cline Report") which made a number of recommendations about how to increase revenues.  These recommendations were discussed with the County in or about May 2008 and R.W. Beck's draft report detailing these recommendations was provided to the County in October 2008.  In November 2008, the County stipulated that the revenue enhancements proposed by the Cline Report (other than the Clean Water Fee, 15% residential discount, and the termination of the private water meter program) are potential sources of revenue that should be examined by the County Commission (Jt. Stmt. ¶85); yet, to date, the County Commission has not adopted any of the Cline Report proposals.

[14]John Young was the County's nomination to serve as Special Master.  Plaintiffs nominated John Ames.  By Order dated November 25, 2008, the court appointed Mr. Young and Mr. Ames to serve as co-Special Masters to investigate the System and make recommendations regarding, *inter alia*, enhancement of revenues, rates, and potential reductions in expenses.

Sewer System has been largely disengaged in any efforts to enhance revenue.[15]  He is not alone.  At

the February 25, 2009 hearing in this case, the court explicitly directed the County not to remain

disengaged, but to make a genuine response to the Special Masters' recommendations in order for

the court to understand what action, if any, the County intends to take.

In response, on March 17, 2009, the County Commission passed a resolution, by a 3-2 margin

which, at best, paid lip service to the directions of the court.  *See* Jt. Stmt. ¶90; Jt. Ex. 73.  Other than

beginning the process to establish a $12, one-time private meter administration fee, the County has

implemented none of the specific revenue enhancements suggested by the Special Masters.  Nor has

the County indicated any intention to raise sewer rates.  In fact, at the June 1, 2009 hearing, the

Commissioners unanimously stated they will not consider raising rates.  Further, although the County

has indicated it will hire a consultant, Raftelis, it has only authorized Raftelis' hiring for a very

limited purpose[16] – reviewing and advising the Commission with respect to four specific items: (1)

a fixed fee for sewer charges (to replace the minimum monthly fee); (2) impact fees; (3) industrial

surcharge and septage rates; and (4) credit for residential customers for water not returned to the

---

[15]During the period of time in which the Special Masters were developing their Report assessing the operation of the ESD, Commissioner Carns only met with them once (for about twenty minutes) and failed to discuss anything of substance.  Despite the fact that he felt like he had only limited information about the Special Master process and may not have understood it, he made no effort to contact the Special Masters to receive more information or become in any way involved in the process.  (*See, e.g.*, Doc. #81, Ex. 2 and 3 at 9-10, 27-28, 69, 70-71).  Further, at the hearing on June 1, 2009, Commissioner Carns was an advocate of standing still (*i.e.*, offering Plaintiffs and the Liquidity Banks only net sewer revenues – which are decreasing even beyond what was budgeted for 2009), rather than developing a plan to solve his department's financial woes.  This is the case despite the fact that, in 2006, before he took office and after studying the Sewer Systems finances, Commissioner Carns noted that the System would go "belly up."  (Carns Depo. at 14:1-15:7; 51:3-12 (Oct. 22, 2008)).

[16]Apparently, the County hired Raftelis in an effort to excuse its default under Section 13.1(b) of the Indenture.

System.  Over two and a half months have passed while the County has been "discussing" a contract with Raftelis and it expects it will take even more time to complete its negotiations (just to enter into a contract).  To say that the County has not made retaining a rate consultant a priority would be a gross understatement.

The County has taken little if any action since the onset of this crisis to generate additional revenues.  Its plan to use System revenues to hire yet another consultant to advise it on a number of items (on which it has already received sound advice from various other well-respected consultants) seems pointless when the previous advice it has received has been ignored. Since it is apparent that any professional advice given to the Commission with respect to System improvements falls on deaf ears, Plaintiffs can take little solace in the County's stated intention to use Raftelis.  Moreover, the County has been given ample time to get its plan of action in order, but unfortunately the evidence of record shows the County has no viable plan.  And while a complete resolution of the County's debt crisis will no doubt require action by parties other than the County, the County's full engagement in this process is a necessary and crucial piece of the puzzle needed to return the Sewer System to financial viability.  As Plaintiffs have asked rhetorically: "How can the County (and this Court) expect the various parties in Montgomery, Washington, D.C. and New York to make the significant concessions that have been asked of them if the County will not do the things that are necessary to help itself?"  The County has demonstrated that it is unwilling to make the hard and politically unpopular – but necessary – decisions to recover financially.

In addition, David Denard, Director of ESD, testified that the County makes no attempt to determine whether a particular expense should appropriately be characterized as an operating expense.  Hearing Tr. 182:21-185:8 (Mar. 26, 2009).  This has led to the improper classification of

a number of expenses, which has diverted substantial net revenues from the Sewer System and caused significant harm to Plaintiffs and the Warrant holders.

As discussed above, during the course of this litigation, the court appointed Special Masters who made substantial efforts to assist the County in overcoming its paralysis in dealing with the financial woes of its Sewer System.  Among other things, the Special Masters prepared a report that contained a number of suggestions for the County to consider.  Although the County asserts that it "has engaged fully in the [Special Master] process the Court crafted and is striving to resolve the sewer crisis" (Def. Br. at 12), that assertion is simply off the mark.  The Commissioner responsible for the ESD not only pleaded "the Fifth Amendment" when asked if he supports the special master process, he also openly criticized one of the Special Masters in a press release.  This was the case despite the fact that he only met with the Special Masters on one occasion for approximately twenty minutes and failed to discuss anything of substance with regard to the Special Masters' efforts to streamline the operations of the Sewer System.  And ironically, the Special Master criticized was originally nominated by the Commissioners' counsel.  There was no basis in fact or logic for the criticisms.  Indeed, at the June 1, 2009 hearing, the Commissioner in question conceded that the Special Masters are not operating under any conflict of interest.

All counsel in this case have agreed that the Special Masters have been of great service to the parties and the court.  For example, it was the Special Masters who initially observed the County is presently facing a budget shortfall of $17 to $20 million.[17]  They have attempted to engage the

---

[17]With respect to this issue, Commissioner Carns' deposition testimony is straightforward and revealing: he was not aware that the County's ESD faced that large of a budget shortfall and neither he (nor anyone else with the County) has any plan in place to recoup the approximate $17 to $20 million revenue hole in the 2009 budget.

County regarding policy and operational improvements to the Sewer System, as well as mediate between the parties (and others) regarding a global resolution of this crisis.  Their performance has been beyond superior.

Finally, as to the squandering of asserts, at the June 1 hearing, testimony was presented that established that there are a number of ESD customers who have received services for which they did not pay.  In some circumstances, this had gone on for up to five or six years.  Although the ESD is now attempting to recoup some of this lost revenue, the County has inexplicably decided to only seek payment for one year of unbilled service.  This is clear evidence of the squandering of assets.  Thus, there is ample evidence on which to base the conclusion that it is likely some assets will continue to be lost or squandered,[18] and the analysis of this factor weighs in favor of appointing a receiver.

       3.     Whether the Availability of Legal Remedies is Inadequate

The Warrants at issue are non-recourse debt.  Thus, any judgment in this action must be paid from the sewer revenues which are undisputedly inadequate.  If one thing in this case is abundantly clear, it is this:  net sewer revenues have been (and still are) insufficient to support the Sewer System's debt service, even if that debt amount does not account for accelerated principal payments

---

[18]One more observation is in order.  The court is unsure of the implications of the Commissioners' vote not to rescind a resolution to pull out of the region's Storm Water Management Authority ("SWMA").  The apparent effect of the vote is that the County will assume the salaries and benefits of 15 employees, at a cost of over $1,000,000, to perform tasks which, under the SWMA, cost the County approximately $400,000 per year.  In explaining his position (opposing the position of Commission President Bettye Fine Collins), Commissioner Carns stated, "We can do that. I haven't worked all the details out yet, but we can certainly do it, . . .. I've got them worked out in my head, but I'm not ready to come forth with them right now."  It is troubling that during a time when it does not have sufficient revenue to operate and service its debt, the County is taking on new employees and substantial expenses.

and higher interest rates caused by market factors and the downgrade of the County's insurers'
ratings. Therefore, this factor also weighs in favor of appointing a receiver.

      4.      <u>Whether there is a Probability that Harm to Plaintiffs by Denial of the
Appointment of a Receiver would be Greater than the Injury to the Parties
Opposing Such an Appointment</u>

The County argues that it is implementing many of the recommendations of the Special
Masters and that a receiver could not do a better job than the Commission of running the Sewer
System. Its argument is principally supported by the testimony and opinions of those who have been
and currently still are in charge of the Sewer System.

However, there is no evidence that the County, who opposes appointment of a receiver,
would be harmed by the appointment of a receiver. The County has introduced evidence of the
awards its Sewer System received for such things as its quality work in the clean water category.
But the salient contention here is not that the County is failing to run a quality shop. Rather, the
point is that the County is not administering the Sewer System in a fiscally responsible manner.
Thus, although clearly the Commission is uncomfortable with the idea that it would lose some
control over the Sewer System, there is nothing in the record to suggest it would be harmed by a
receiver's better management of its administrative and financial operations.

To the contrary, a receiver would *enhance* the operational efficiencies of the Sewer System.
He would maximize revenues, attempt to make the Sewer System a more streamlined operation, and
help it pay its debts. Although the parties disagree as to whether a receiver should be appointed, they
are in apparent agreement that John Young, one of the Special Masters, would be a good candidate
for that position. Among other things, he has professional experience privately operating sewer
systems. If he is not successful in that field, he, unlike the County, will be out of business. The

court fails to see how the appointment of someone with professional experience running a sewer system in the place of a five-member Commission with no such experience, would harm the County. Thus, the evidence on this factor weighs in favor of the appointment of a receiver.

5.      Whether Plaintiffs Will Probably Succeed in this Action

Plaintiffs have alleged nine types of Events of Default and have presented evidence supporting each of their claims.  Admittedly, the County has asserted defenses to some of these claims.  As to the first alleged Event of Default, *i.e.* the County's failure to pay principal on the Warrants when due on each of June 2, 2008, August 1, 2008, October 1, 2008, January 1, 2009, February 20, 2009 and April 1, 2009, the County can hardly dispute that it did not make these payments in full.  Nevertheless, the County attempts to dispute that these are Events of Default. According to the County, the fact that the insurers made these payments on its behalf somehow cures these Events of Default.   This argument simply ignores Section 17.3 of the Indenture, "Miscellaneous Special Provisions Respecting the Bond Insurer and the Bond Insurance Policy," which provides in relevant part,

> (a) In determining whether a payment default has occurred . . ., no effect shall be given to payments made under the insurance policy.

Therefore, it appears that Plaintiffs will have probable success in litigating this Event of Default.

It is also undisputed that the County failed "to satisfy the Rate Covenant."  The County argues this is not an Event of Default because it has employed "a utility system consultant to review the System and its existing rates and fees and [made] a good faith effort to comply with the recommendation of such consultant."  Indenture Section 13.1(b).  In January, the County passed a resolution essentially determining that it would not comply with the Rate Covenant.  Not until mid-

24

March did it pass a resolution authorizing the hiring of a utility system consultant.  However, the resolution only authorizes the County to hire the proposed utility consultant to "advise the Commission on the appropriate amounts for a. a fixed monthly fee for sewer service (to replace the current minimum monthly charge); b. impact fees; c. industrial surcharge and septage rates; and d. credit for residential customers for water not returned to the sewer system."  (Doc. #72, Appendix 1.)  Despite the fact that the resolution authorizing the hiring of a rate consultant was passed in March, testimony at the June 1, 2009 hearing established that the consultant had not yet been hired, and that some seventy plus days after the resolution passed, there is still no agreement as to the scope of work the consultant would perform.  It was anticipated that the agreement on the scope of work would take approximately sixty more days.  However, the Commission's resolution does not authorize the hiring of a utility consultant "to review the System and its existing rates and fees."  The Commission's resolution appears to contemplate a much narrower role for this utility consultant.  Moreover, at the June 1 hearing, the Commissioners made it quite clear that they would not consider raising rates.  Based on this evidentiary record, the County cannot rely on Section 13.1(b) of the Indenture to excuse its failure to comply with the Rate Covenant.

As to other types of Events of Default, the County has repeatedly protested that a large portion of its financial woes were caused by the downgrade of the Insurers' credit ratings and, thus, these Events of Default should not be held against it.  This argument suffers from at least three fatal flaws.  First, the County voluntarily exposed itself to these risks when it replaced its fixed-rate financing with adjustable-rate financing.  Second, this argument only applies to claims by the *Insurers*; the *Trustee*, also a plaintiff, is blameless in this regard.  Finally, the record before the court makes it crystal clear that the County could not afford to pay back the initial amounts it borrowed

at the fixed rates it enjoyed even before it opted to venture into the variable and auction-rate market. For these reasons, the County's assertion is off the mark.

Based upon the evidence presently before the court, the court finds that Plaintiffs have a probability of success on the merits.[19]   Therefore, this factor weighs in favor of appointing a receiver.

      6.      Whether the Interests of Plaintiffs and Others Will be Well Served by the Receivership

Frankly, analysis of this factor requires speculation.  However, the evidence regarding the County's failure or refusal to act (or at best its glacial speed in acting) to resolve the issue of insufficient sewer revenues compels the conclusion that the interests of Plaintiffs and others may well be served by the appointment of a receiver.

      7.      Whether Equitable Principles Counsel Against Enforcing the Terms of the Indenture[20]

Facing the compelling evidence of Events of Default on its part, the County now argues that its contractual obligations should be ignored and equitable principles applied to deny Plaintiffs' enforcement of the express terms of the Indenture.  The words of Judge Kristi Dubose in *Wachovia Bank v. Bon Secour Village, LLC*, Case No.  1:07-CV-00861-KD-C, pending in the Southern District of Alabama, are equally applicable here: "There has been no evidence presented to persuade the Court that the terms of the contract should be ignored in favor of equitable principles."  (Southern

---

[19]In fairness, the court is perplexed by the issue of whether Plaintiffs were required to present their receivership claim to the County pursuant to Alabama Code § 6-5-20.  Indeed, that is the only factor that causes the court to hesitate in finding that Plaintiffs are likely to succeed on the merits of the receivership claim.

[20]The court distinguishes this question – whether equitable principles counsel against appointment of a receiver – from the separate issue of whether jurisprudential factors (*i.e.*, the doctrine of abstention) suggest such an appointment would be improper.  The court addresses the latter issue *infra*.

District of Alabama Case No. 1:07-CV-00861-KD-C, Doc. #25 at 5). Rather, analysis of the relevant factors leads this court to the conclusion that a receiver should be appointed.

Having considered the appropriate factors and found that an analysis of the factors weighs in favor of the appointment of a receiver, and considering the fact that the County entered into agreements *twelve times* promising that a receiver would be an appropriate remedy in the event of default, the court concludes that Plaintiffs have presented sufficient evidence indicating their entitlement to this remedy.

Notwithstanding the court's findings of fact and conclusions regarding the availability of a receivership remedy, the County has raised significant arguments about this court's jurisdiction to impose that remedy. It is unfortunate that the County did not proffer these arguments earlier in this litigation. However, these jurisdictional issues cannot be ignored.

**B.      The Johnson Act Prohibits this Court from Exercising Jurisdiction to Appoint a Receiver with Rate-Making Powers**

From the outset of this case, it has been clear that Plaintiffs clearly desire the appointment of a receiver who has the power to raise rates in order to maximize the Sewer System's revenues. In response to that particular request for relief, Defendants have argued that this court is precluded from exercising jurisdiction to appoint a receiver with the authority to affect sewer rates under the Johnson Act. The Johnson Act provides as follows:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
> > (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
> > (2) The order does not interfere with interstate commerce; and,
> > (3) The order has been made after reasonable notice and hearing; and,

27

(4) A plain, speedy and efficient remedy may be had in the courts of such
State.

28 U.S.C. § 1342.  The Johnson Act "has been broadly construed to prohibit federal court actions

that indirectly as well as directly affect rate orders."  *Carlin v. Southern Bell Tel. & Tel. Co.*, 802

F.2d 1352, 1356 (11th Cir. 1986); *accord, e.g., U.S. West Inc. v. Tristani*, 182 F.3d 1202, 1207 (10th

Cir. 1999) (Act "'broadly applied'" to prohibit "'challenges to orders affecting rates'") (quoting

*Hanna Mining Co. v. Minnesota Power & Light Co.*, 739 F.2d 1368, 1370 (8th Cir. 1984)); *Brooks*

*v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1053-54 (9th Cir. 1991) (Act "broadly

construed" to bar "'all challenges affecting rates'") (quoting *Miller v. New York State Publ Serv.*

*Comm'n*, 807 F.2d at 28, 31 (2d Cir. 1986)).  Under this "effects test," the Act is inapplicable only

when "the relief [the plaintiff] seeks, if granted, would not in any way affect the rates established"

by the ratemaking authority.  *Carlin*, 802 F.2d at 1356.[21]

"It is the general view that this Act requires all four conditions to be present before the Act

can apply and thereby limit the court's jurisdiction."  *DeKalb County v. Southern Bell Telephone and*

*Telegraph Co.*, 358 F.Supp. 498, 504 (N.D. Ga. 1972), *aff'd*, 478 F.2d 700 (5th Cir. 1973) (citing

*United States v. Public Utilities Comm. of Cal.*, 141 F.Supp. 168, 183 (N.D. Cal. 1956); *aff'd*, 355

U.S. 534 (1958)).  It comes as no great surprise that the parties disagree about the application of the

four conditions and whether the Johnson Act applies to bar this court from appointing a receiver with

rate-making authority.  Plaintiffs' arguments regarding the Johnson Act are somewhat of a moving

target.  As best the court can tell, however, they argue that the Johnson Act does not apply for several

---

[21]Both Plaintiffs' demotion of *Carlin* to a footnote and their repeated refusal to engage the
"effects test" that *Carlin* embodies (consistently with every other court of appeals to address the
issue) are telling.  (*See* Doc. #86 at 10 n.13).

reasons.  First, they contend that because they are not challenging an order setting rates, but rather are seeking the appointment of a receiver to stand in the shoes of the County with respect to the enforcement of an order regarding rates, the Act does not apply.[22]  Second, they argue that this matter is not in this court based solely on diversity jurisdiction in that they seek to enforce the 1996 Consent Decree resolving violations of the Clean Water Act.   Third, they assert that the rate order at issue has an effect on interstate commerce because it affects the County's ability to make payments to Warrant holders who reside out of state.   Finally, they argue that a plain, adequate and speedy remedy is not available in state court because in another case filed against Jefferson County (initiated on the same date as this case and discussed more fully below), all of the judges in Jefferson County recused themselves, and the Alabama Supreme Court has yet to assign the case to a judge who has not recused.  They predict that the same result will occur in this case.  For the reasons explained below, the court finds that each of these arguments are unavailing.

      1.    <u>Plaintiffs' Claims and Their Requested Relief of the Appointment of a Rate-Making Receiver Implicate the Johnson Act</u>

Plaintiffs argue that the Johnson Act does not apply because they claim they do not challenge or seek to enjoin an order affecting rates.  They argue further, without citation to any applicable

---

[22]Plaintiffs' Counsel:  "We're not asking you to enter an order to set a rate or affect a rate ...."

  The Court:  "You're asking me to appoint a receiver to set a rate and affect a rate."

  Plaintiffs' Counsel:  "That's right."

(*Id*. at 18-19; *see also* Tr. of March 26 Hearing at 36-38).  Plaintiffs make the same argument in their brief:  "In appointing a receiver, the Court would not be enjoining a rate order, because the Court would not be changing rates, the receiver would."  (Doc. #86 at 8).

authority, that if the relief they seek is granted, the receiver would merely step into the County's shoes with the ability to set rates.

The flaw in Plaintiffs' argument is this – the courts have recognized that the Johnson Act applies not only to frontal attacks on orders affecting rates, but also to "federal court actions that indirectly as well as directly affect rate orders, ... ." *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.,* 802 F.2d 1352, 1356 (11th Cir. 1986). Indeed, the Eleventh Circuit has indicated that it believes the Johnson Act has broad application. In *Marshall County Bd. of Educ. v. Marshall County Gas District*, 992 F.2d 1171, 1177 (11th Cir. 1993), the Eleventh Circuit did "not reach the question of whether the Johnson Act bars jurisdiction," but it nonetheless noted that "the unambiguous language of the statute expresses Congress' intent that federal courts should not interfere with a state's control over public utility rates." Plaintiffs seek to have this court impose *injunctive relief*, (*i.e.* the appointment of a receiver) upon Defendants which *would* have an effect on an order affecting rates (*i.e.* the Rate Ordinance). Specifically, Plaintiffs seek the appointment of a receiver with the power to raise rates and the power to impose other fees on Sewer System customers and even non-customers. In this Circuit (and others) the Johnson Act has not been given the narrow interpretation urged by Plaintiffs. Therefore, consistent with its remarks at the March 26 and June 1, 2009 hearings and its discussion below, the court finds that the Johnson Act applies to bar this court from imposing any injunctive relief which would affect sewer rates in any manner.[23]

---

[23]In this case, the issue regarding rates is, at least in part, the fact that Defendants *have not* raised rates. Moreover, they *have not raised rates* even in the face of the 1997 Rate Order and Resolution which provides for annual automatic rate increases based on a specified formula which requires an increase in rates. To avoid a January 2009 rate increase, Defendants passed a resolution which had the effect of not complying with the Rate Order and Resolution. Plaintiffs seek injunctive relief, *i.e.*, the appointment of a receiver, who could step in and raise rates, either in compliance with the 1997 Rate Order and Resolution, or otherwise (in further contravention of the 1997 Rate Order

Based on the foregoing, it is crystal clear that the relief sought by Plaintiffs is injunctive and would have an effect on an order affecting rates. Therefore, the threshold issue of whether the Johnson Act applies is properly before the court. Further, analysis of "the other necessary conditions of the Johnson Act" reveals that they "are present to exclude jurisdiction." *DeKalb County*, 358 F.Supp. at 504.

             a.     Jurisdiction is Based Solely on Diversity of Citizenship

The next argument advanced by Plaintiffs to avoid application of the Johnson Act is that this action is not based solely on diversity. Rather, Plaintiffs have attempted to invoke federal question subject matter jurisdiction under the Consent Decree entered into on December 9, 1996. The argument is simply a thinly veiled attempt to skirt the Johnson Act. At the court's behest, albeit admittedly before the Johnson Act issues were raised, the parties entered into certain stipulations regarding undisputed matters in this case. Among the matters to which the parties stipulated is that Plaintiffs are *not* seeking the emergency appointment of a receiver under the Consent Decree. "At this time, the Plaintiffs are not asserting that a receiver is necessary to ensure the sewer system's compliance with the Consent Decree or Clean Water Act." (Doc. #75 at 12, ¶ 97). In the same filing, Plaintiffs also agreed that the court's jurisdiction had been invoked in diversity. (*See id*. at 29, ¶ 3). These stipulations are consistent with Plaintiffs' admission that they "are not seeking to enforce the terms of the Consent Decree." (Doc. #32 at 16, ¶ 147) (Plaintiffs' position)). Thus, Plaintiffs have previously stipulated (1) that they are not seeking to enforce the terms of the Consent Decree, (2) that they are not asserting that the appointment of a receiver under the 1996 Consent

---

and Resolution). To the extent that this court appoints a receiver with the ability to affect rates, that injunctive relief *would have* an affect on the 1997 Rate Order and Resolution in that the receiver would either bring the County into compliance with that Order, or it will not.

Decree, and (3) that "the Court's jurisdiction has been invoked on diversity grounds." Given

Plaintiffs' repeated stipulations – none of which Plaintiffs so much as mention in their briefing – it

is simply not debatable that Plaintiffs' invocation of the Consent Decree has no place in the court's

consideration of the Emergency Motion. Although Plaintiffs may not have been aware of the

Johnson Act jurisdictional issue at the time they made those stipulations, that does not serve as a

proper basis for allowing them to ignore (or escape) these stipulations.[24]

---

[24]The stipulation entered into by the parties undercuts Plaintiffs' arguments, but that is not the only basis for concluding that this is a diversity case and nothing more. Simply stated, Plaintiffs lack standing to enforce the Consent Decree. (*See* Doc. #11 at 26-28; Doc. #31 at 20). First, in a previously field brief, Plaintiffs declined "to debate their standing to enforce the Consent Decree." (Doc. #34 at 19-20 n. 30). In their March 2009 brief – and in their post-hearing papers – Plaintiffs were conspicuously silent with respect to standing. (*See* Doc. #74 at 18-21) (discussing federal law but ignoring the Consent Decree); (Doc. #86 at 13-15) (discussing "jurisdiction" but never mentioning standing). And with good reason. Try as it might, the court has discerned *no* theory under which Plaintiffs in this case have the requisite stake in the quality of Jefferson County's water supply to sue on the Consent Decree – let alone seek an emergency receiver based on it. *See, e.g., Summers v. Earth Island Institute*, 129 S.Ct. 1142, 1149 (2009) (plaintiff must demonstrate sufficient stake "'to warrant his invocation of federal-court jurisdiction'" (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)) (emphasis added in *Summers*).

Second, not only can Plaintiffs claim no stake in Jefferson County's water quality, but they have not – and cannot – allege that the County has violated the Consent Decree. By contrast, Plaintiffs concede (as they must) that "[a]t this point, the County is in compliance." (Tr. of March 26 Hearing at 23). Unfazed by these key concessions, Plaintiffs nevertheless argue that the County's actions "*threaten the prospect* that the County can continue to abide by the Consent Decree" and that "the County's defaults under the Indenture, unless cured, *may well* make current and future compliance impossible." (Doc. #79 at 8, 9; Doc. #86 at 14-25) (emphasis added). This type of speculation does not show the sort of imminence required under Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006). Plaintiffs cannot ask for emergency relief on the basis of an agreement to which they are *not* parties and of which the County is *not* in violation. In addition, the Consent Decree cannot – and does not – provide the basis for the relief that Plaintiffs request – namely, the appointment of an emergency receiver to protect their alleged interests under the Indenture.

b.       The Order at Issue Does Not Interfere with Interstate Commerce

Plaintiffs' argument that the order at issue, the 1997 Rate Order and Resolution, interferes with interstate commerce is misplaced and betrays a fundamental misunderstanding of the Johnson Act's "interstate commerce" condition.  As the County correctly observes, Plaintiffs' contention is that the condition fails so long as there exists some "effect" on interstate commerce in the *Wickard v. Filburn*, 317 U.S. 111 (1942) sense – *i.e.*, so long as Congress could plausibly regulate under its Commerce Clause power.  But the Johnson Act's interstate commerce condition cannot be construed so broadly, and that argument is in error.  The Act's interstate commerce condition is concerned not with interstate "effects" in the *Wickard* sense, but rather with interstate discrimination and burdens in the *dormant* Commerce Clause sense.  Indeed, on Plaintiffs' reading, it is difficult to imagine a utility rate order to which the Johnson Act would *ever* apply.  Every rate order will presumably always have some "effect" on interstate commerce.  Plaintiffs' loose construction of the interstate commerce condition, therefore, would take an Act that was fundamentally intended to get federal courts out of the local rate-making business and reconceptualize it so as to put them right back in the middle of it.  "Generally, state agency orders setting intrastate [utility] rates do not interfere with interstate commerce."  *US West, Inc. v. Nelson*, 146 F.3d 718, 724-25 (9th Cir. 1998) (citing *Kalinsky v. Long Island Lighting Co.*, 484 F.Supp. 176, 178 (E.D.N.Y. 1980) and *Zucker v. Bell Tel. Co.*, 373 F.Supp. 748, 751 (E.D. Pa. 1974), *aff'd*, 510 F.2d 971 (3rd Cir. 1975)).  The Rate Order and Resolution itself merely purports to set rates charged to Jefferson County Sewer System customers - customers on a sewer system contained exclusively within Alabama.

> Certainly all state rate-making action does have some influence upon or effect upon interstate commerce but these actions do not necessarily interfere with interstate

commerce and the magnitude of the harm threatened by inadequate intrastate rates does not provide a cause for ignoring the clear mandate of the Johnson Act.

*US West, Inc.*, 146 F.3d at 724 (quoting *Louisiana Power & Light Co. v. Ackel*, 616 F.Supp. 445, 448 (D. La.1985) (citing *Kansas-Nebraska Natural Gas Co. v. City of St. Edward*, 234 F.2d 436 (8th Cir.1956) (holding that incidental and indirect effects on interstate commerce do not rise to the level of "interference" for purposes of the Johnson Act))).

What interferes with interstate commerce as it relates to this case is not the order at issue,[25] but rather the County's failure to pay its debt obligations under the various indentures into which it entered. It is that failure to pay, rather than the Rate Order and Resolution (which was designed to set the sewer rates for Jefferson County), which affects interstate commerce and Warrant holders outside of the state. The controlling question here is whether the "order" itself (as opposed to this litigation) "interferes with" (as opposed to merely "affects") interstate commerce. The answer is clear – it does not.[26] *See Kalinsky v. Long Island Lighting Co.*, 484 F.Supp 176, 178 (E.D.N.Y.

---

[25]The arguments presented by Plaintiffs on this issue do not even address whether the relevant "order" – here, the Rate Order and Resolution – *itself* interferes with interstate commerce. Instead, Plaintiffs focus exclusively on the arguably interstate aspects of the current litigation. Plaintiffs point out that the Insurers and underwriters are "located outside of Alabama," and the Warrant holders "represent people and entities from around the country and world." (Doc. #86 at 15). Plaintiffs likewise stress that "this case" has "received national press coverage." (*Id.*). However, Plaintiffs never make any effort to tie their argument back to the Johnson Act's text – because they cannot. Under the Act, what matters is whether the "order" – not some larger piece of litigation, but the *order itself* – interferes with interstate commerce. Plaintiffs have not even addressed that question, let alone provided a convincing answer to it.

[26]As some of the leading commentators point out, the interstate-commerce condition serves the limited purpose of carving out dormant Commerce Clause challenges from the Act's broad prohibitive scope. *See* R. FALLON, ET AL., HART & WECHSLER'S THE FEDERAL COURTS & THE FEDERAL SYSTEM 1172 (5th ed. 2003); *accord* 17 A. WRIGHT, A. MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 4236, at 234 (2d ed. 1997) (noting that interstate-commerce condition is "of doubtful meaning and limited importance"). A local utility's rate order "interfere[s] with" interstate commerce only where: (1) the order purports to regulate in a field preempted by Congress,

1980); *South Cent. Bell Tel. Co. v. Pub. Serv. Comm'n of Kentucky*, 420 F.Supp. 376, 377-78 (W.D. Ky. 1976).  Therefore, the order at issue does not interfere with interstate commerce.

c.      The Order Was Made after Reasonable Notice and Hearing

The question of whether the Rate Order and Resolution was made after reasonable notice and a hearing requires little discussion here.  The Jefferson County Commission's customary practice is to give notice when it intends to modify rates and holds public hearings before it acts.  The 1997 Rate Order and Resolution was adopted by the Jefferson County Commission in a public hearing. Therefore, this condition has been met.

d.      A Plain, Speedy and Efficient Remedy May Be Had in the Courts of Such State

"Finally, assuming the first three conditions to be present, the Act prohibits federal jurisdiction when there is a remedy available in the state courts."  *DeKalb County*, 358 F.Supp. at 504.  "[T]he legislative history of the Johnson Act, ... , makes clear congressional intent that a state remedy is 'plain, speedy and efficient' even though [one] must proceed first through administrative and then judicial proceedings ... ."  *California v. Grace Brethren Church*, 457 U.S. 393, 417 n.35 (1982) (citing S. Rep. No.125, 73d Cong., 1st Sess., 2-3 (1933)).

> To be "plain, speedy and efficient," the state remedy need only satisfy minimal procedural requirements. Succinctly put, the state remedy is "plain" as long as the remedy is not uncertain or unclear from the outset; "speedy" if it does not entail a significantly greater delay than a corresponding federal procedure; and "efficient" if the pursuit of it does not generate ineffectual activity or unnecessary expenditures of time or energy.

---

*see Pub Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456 (1943); or (2) the order applies to a commodity that has itself been shipped in interstate commerce and does so in a way that would discriminate against or burden the interstate shipment of that commodity.  *See Nucor Corp. v. Nebraska Power Dist.*, 891 F.2d 1343 (8th Cir. 1989).

*US West, Inc.*, 146 F.3d at 724-25 (citing *Brooks v. Sulphur Springs Valley Elec. Co-op.*, 951 F.2d

1050, 1054 (9th Cir.1991)  (citing *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 517-21 (1981))).

Plaintiffs cannot assert that they lack an adequate remedy in state court.  Without question,

they could have filed a lawsuit in state court requesting the same relief they have requested here –

contract damages and, more importantly for present purposes, a receiver.  *See* Ala. Code § 6-6-620

*et seq*.  Thus, Plaintiffs state-court remedy is materially identical to their federal-court remedy.

And, in fact, Plaintiffs do not complain about the adequacy of their remedy *per se*.  They

tacitly concede (as they must) that a breach of contract action is "plain" and that litigating novel

questions of Alabama law in Alabama courts would be "efficient." Rather, Plaintiffs' argument rests

entirely on their *assumption* that the state court in which they would file would be insufficiently

"speedy."  That argument fails for several reasons.

First, Plaintiffs complain about what they perceive will be a lack of dispatch with which the

Jefferson County Circuit Court would act on their claims.  Even assuming the accuracy of all of

Plaintiffs' assumptions about how state-court proceedings might unfold, Plaintiffs have not shown

a lack of "speed[]" in the Johnson Act sense.  As the Supreme Court has held in a Tax Injunction

Act[27] case, a delay of even years, while "regrettable," does not render a state court insufficiently

"speedy."  *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 518-20 (1981).  Plaintiffs' failure even to

address – much less attempt to distinguish – *Rosewell* is telling.  Plaintiffs are complaining about

the prospect of a six-month delay; however, the Supreme Court did not find a delay four times that

long to lack a sufficient speed.

---

[27]The Tax Injunction Act, 28 U.S.C. § 1341, and the Johnson Act are companion provisions, and cases interpreting one are often cited as authority with respect to the other. *See, e.g., California v. Grace Brethren Church*, 457 U.S. 393, 410 n.22 (1982).

Second, as the County observes, although Plaintiffs purport to be concerned about the speed with which a state court might act, the question remains: Relative to what? If this court were to grant Plaintiffs' emergency motion, the County would have an immediate appeal as of right to the Eleventh Circuit. *See* 28 U.S.C. § 1292(a)(2). That appeal, realistically, would take months. Of course, the losing party in the Eleventh Circuit would presumably petition the United States Supreme Court for certiorari; that process would likely add more time to the litigation (and a good bit more if the petition were granted). Should either the Eleventh Circuit or the Supreme Court agree with the County, on either Johnson Act or abstention grounds, Plaintiffs will end up right back where they should be now – in state court.[28] Further, even if Plaintiffs were to prevail on appeal, once the case returned to this court, it would *still* be in its infancy.[29]

---

[28]Whether a state court remedy is plain, speedy and efficient is determined *not* at the time of dismissal, but at the time when Plaintiffs initially selected their forum. *Henry v. Metro. Dade County*, 329 F.2d 780, 781 (5th Cir. 1964); *Klotz v. Consol. Edison Co. of New York*, 386 F.Supp. 577, 586-87 (S.D.N.Y. 1974) (stating, *inter alia*, that "[t]he availability of a direct action for a declaratory judgment in the state courts is sufficient to satisfy the requirement for a plain, speedy and efficient state remedy..."); *Preston County Light & Power Co. v. Pub. Serv. Comm'n*, 297 F.Supp 759, 766 (D. W.VA. 1969).

[29]To be sure, for all the activity on Plaintiffs' emergency motion, this case has barely progressed past the pleadings. There has been no parties' planning meeting, no scheduling order, only limited discovery, no dispositive motion schedule, and no trial date set. That is not the fault of the parties, but it is a reality. Moreover, Plaintiffs have argued that there has already been delay in their remedy because (1) this case has been allowed to proceed in this court, and (2) Defendants did not raise the Johnson Act issue at an earlier stage in the litigation. There are a number of responses to these concerns. First, Plaintiffs chose to file this suit in federal court. While the Johnson Act defense was recently raised, the Johnson Act was not recently enacted. (Indeed, it has been codified for over seventy years.) Had Plaintiffs chosen to pursue a receiver in a state forum, they would not have had to confront this jurisdictional hurdle. Second, the parties' litigation efforts need not be duplicated in state court. The parties are free to use the discovery and transcripts developed in this case in state court. Third, many of the delays in this case have been caused by the court and parties' desire and efforts to seek a global resolution of this matter. The court makes no apologies for that and certainly does not think that time was wasted, even if the efforts to date have been unsuccessful. Finally, "[t]he fact of the matter is that legal conflicts are not resolved as quickly

Finally, the heart of Plaintiffs' "speed" arguments is ultimately premised on a series of suppositions. Based entirely on the case of *Wilson v. J.P. Morgan Chase, et al.*, CV-08-901907, currently pending in Jefferson County Circuit court, (*see* Doc. #79 at 9-11), Plaintiffs assert that a suit in state court would be plagued by a "virtually certain" mass-recusal of the entire Jefferson County bench. Even assuming such a mass recusal, Amendment 328 to the Alabama Constitution provides a process by which the Chief Justice selects alternate judges. The Amendment's existence (combined with the presumption of regularity) is evidence that a mass recusal would not cause undue delay. Thus, there is already a plain, speedy, and efficient state-law remedy in place to address even Plaintiffs' worst-case scenario. Moreover, there are literally hundreds of state court judges to whom Chief Justice Cobb could assign this case. This case is also distinguishable from *Wilson* in this respect – *Wilson* is a putative class action, which presumptively gives every potential class member a direct pecuniary interest in the outcome and requires judges to be especially sensitive to issues that could lead to recusal or disqualification. As a non-class action, this case does not appear to present that same recusal conundrum.

        e.       <u>Plaintiffs Cannot Point to a Single Case Where a Receiver With the Power to Affect Utility Rates was Appointed by a Federal Court</u>

To be sure, the court has given Plaintiffs a substantial period of time to research the issue of whether a federal court has ever appointed a receiver with the power to adjust utility rates. At the March 26, 2009 hearing, the following colloquy occurred:

---

as we would like." *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 519 (1981) (holding that a 2-year delay does not justify the conclusion that the remedy is not speedy). Plaintiffs have sought extraordinary relief in this complex case. They cannot reasonably expect to have a receiver appointed over the sewer operations of the largest County in the State without full scale litigation and some level of judicial scrutiny.

| | |
|---|---|
| Plaintiffs' Counsel: | "Your Honor, there are dozens of cases in which a federal court has appointed a receiver.  And the fact that the receiver takes over the county's –" |
| The Court: | "Any cases you know where a federal court appointed a receiver to affect rates and that was upheld by a court of appeals?" |
| Plaintiffs' Counsel: | "Your Honor, I don't have a direct answer to that, but we would love to look." |
| The Court: | "I'm going to give you that chance." |
| Plaintiffs' Counsel: | "Yes, sir." |
| The Court: | "And I'm not going to make you do it by the end of the hearing.  I'm going to give you some more time than that." |

(Tr. of March 26 Hearing at 20-21).  After that exchange, the only case Plaintiffs have pointed to is *Warrenville State Bank v. Farmington Township*, 185 F.2d 260 (6th Cir. 1950).  As Plaintiffs concede, however, neither the District Court nor the Sixth Circuit *mentioned* the Johnson Act. Indeed, the District Court and Sixth Circuit opinions are both silent with respect to the Act's application.  Accordingly, the case is of negligible value; at most, Plaintiffs can speculate on how the courts *might* have ruled if the Johnson Act *had* been considered.

As matters stand now, having accepted the court's invitation, Plaintiffs have been unable to locate a single case in which a federal court appointed a ratemaking receiver in the face of a Johnson Act objection and was affirmed on appeal.  Apparently, therefore, Plaintiffs' own research is consistent with the court's analysis: if this court were to appoint a ratemaking receiver over Jefferson County, that would not only be inconsistent with the Act, it would be a first.

"The obligation of [this] federal court is clear from a reading of the Johnson Act. The existence of a remedy in the State court effectively ousts the federal court of jurisdiction, and the

initial suit filed by appellant was properly dismissed." *Henry v. Metropolitan Dade County*, 329 F.2d 780, 781 (5th Cir. 1964) (affirming dismissal even where the time in which the state suit might have been brought had expired). "[T]he legislative history of the Johnson Act supports a broad interpretation of its jurisdiction-limiting effect." *Beechwood Dev'p., LLC v. Olympus Terrace Sewer Dist.*, 2005 WL 2573331, *2 (W.D. Wash. 2005) (citing *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1054 (9th Cir.1991)). Because the court finds that all of the conditions for the application of the Johnson Act have been met, the Johnson Act deprives this of jurisdiction to appoint a receiver with rate-making authority.

### C. The Proper Course Is For This Court To Abstain From Deciding Whether to Appoint A Receiver Who Does Not Have Ratemaking Authority

From the very beginning of this litigation, Plaintiffs have pursued the appointment of a receiver with rate-making authority – principally because they want someone to increase sewer revenues (including raising sewer rates) and the County Commissioners are unwilling to do that. Indeed, at the February hearing, before the County had raised its Johnson Act challenge, counsel for the Trustee stated unequivocally that "receivership is *meaningless* until the receiver is *empowered to raise revenue* and cut expenses." (Tr. of Feb. 25, 2009 Hearing at 11 (emphasis added); *see also* Doc. #1 at ¶¶ 57, 59, 62, 64, 69, 74, 82, Prayer for Relief at ¶¶ iii, and iv; Doc. #8 at ¶ 9). And to be clear, even now Plaintiffs clearly desire the appointment of a receiver who would have the power to adjust rates. However, in light of the County's arguments regarding the Johnson Act, Plaintiffs have argued alternatively that, if the court determines that it lacks jurisdiction to appoint such a receiver, the court should appoint a receiver without rate-making authority. Defendants argue that the court should abstain from making such an appointment because rendering a decision would

require the court to decide unsettled issues of Alabama law, something better left to courts of the State of Alabama[30] under traditional notions of federalism and comity.

Principles of abstention evolve from concepts of federalism, and issues of federalism involve some of the most important decisions by federal courts and significant debates in American politics – the boundaries between state and federal power.  Indeed, Justice O'Connor has referred to the Supreme Court's responsibility to define the boundaries of federalism – that is, discerning the proper division of authority the Federal Government and the States – as the nation's "oldest question of constitutional law."  *New York v. United States*, 505 U.S. 144, 149 (1992).  "Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722 (1996) (citing *Burford*, 319 U.S. at 332-333 and *Younger v. Harris*, 401 U.S. 37, 44-45 (1971)).[31]  When they abstain,

> federal courts, "exercising a wise discretion", restrain their authority because of "scrupulous regard for the rightful independence of the state governments" and for the smooth working of the federal judiciary ... . This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and

---

[30]While Plaintiffs predictably contend the court should not abstain, in addressing that issue, the vast majority of cases they cite for the proposition that this court can award them the substantive relief they seek (*i.e.*, a receiver over the Sewer System) were decided by Alabama *state courts.*

[31]The doctrine of abstention is driven by:

> the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601 (1975) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)).

federal authority without the need of rigorous congressional restriction of those powers.'

*Burford*, 319 U.S. at 332-333 (quoting *Railroad Commission v. Pullman Co.*, 312 U.S. 500, 501 (1941)).  Under these principles, a court's "discretion to decline to exercise its jurisdiction [also] may be applied when judicial restraint seems required by considerations of general welfare."*Burford v. Sun Oil Co.*, 319 U.S. 315,  333, n.29 (1943) (quoting *Virginian Ry. Co. v. System Federation*, 300 U.S. 515, 552 (1937)).[32]

The Supreme Count has recognized a number of interrelated "abstention" doctrines, but they all serve essentially the same purpose – namely, in appropriate circumstances, to defer a decision in federal court in favor of proceedings in a state forum.  Each of these abstention doctrines is firmly rooted in principles of federalism.  "Where parties have come into federal court for a determination of rights, the federal court should not only stay its hand but should dismiss the action, where there is available in the state courts *a complete and adequate remedy* for the determination of the same questions presented in the federal action."  *Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1143 (10th Cir. 1974) (emphasis added) (citing *Alabama Public Service Commission v. Southern Ry.*, 34 U.S. 341 (1951)).  Of particular import to this court's abstention analysis is the fact that, based upon the court's conclusion that the Johnson Act does not permit appointment of a rate-making receiver, a "complete and adequate remedy" is not available to Plaintiffs in *this* court.[33]

---

[32]To be clear, as discussed *infra*, the court's abstention analysis is based on *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959).  However, *Burford* abstention is certainly related to - and in some ways - an extension of *Thibodaux*; therefore, the court's citation to *Burford* is appropriate.

[33]While it is indeed an important factor in the court's abstention analysis that the Johnson Act precludes the appointment of a receiver with rate-making authority, the court emphasizes the following point.  Even if the court were to determine that the Johnson Act did not divest it of

Defendants argue that the court should abstain under three separate abstention doctrines: *Thibodaux* abstention, *see Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959); *Burford* abstention, *see Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); and *Williams* abstention, *see Pennsylvania v. Williams*, 294 U.S. 176 (1935). However, Defendants' primary argument is that the *Thibodaux* abstention doctrine requires that this court abstain because any decision regarding (1) whether a receiver should be appointed or (2) the scope of such a receiver's duties would implicate unsettled questions of state law.

The policy reasons which undergird federal court abstention are not new. "It is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Williams*, 294 U.S. at 185. Exercising jurisdiction over Plaintiffs' claims seeking the appointment of a receiver requires the court to consider the issuance of injunctive relief which would necessarily affect the exercise of authority currently vested in the elected officials of the Jefferson County Commission. Plaintiffs have asked this court to place certain authority – management and control of the operations

---

jurisdiction, "it by no means follows from [that] fact ... that such jurisdiction must be exercised in [this] case" as it relates to the appointment of a rate-making receiver. *Alabama Pub. Serv. Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 345 (1951). "Frequently one of the abstention doctrines or other considerations of comity will indicate the desirability of leaving the plaintiff to his remedies in the state system even where the Johnson Act does not apply." 17A WRIGHT & MILLER, *supra*, § 4236, at 241. A number of cases fit that pattern precisely. *See, e.g., Southern Ry. Co.*, 341 U.S. at 350 (assuming Johnson Act inapplicable but abstaining in deference to state administrative process); *New Orleans Pub. Serv., Inc. v. City of New Orleans*, 782 F.2d 1236, 1242 (5th Cir.), *amended in part*, 798 F.2d 858, 860-64 (5th Cir. 1986) (holding Johnson Act inapplicable but abstaining); *ALCOA v. Utils. Comm'n of the State of N.C.*, 713 F.2d 1024, 1027, 1030 (4th Cir. 1983) (same). Even if the court had not concluded that the Act bars appointment of a rate-making receiver, it would have in all likelihood abstained on that issue as a matter of comity. *City of Monroe v. United Gas Corp.*, 253 F.2d 377, 381 (5th Cir. 1958); *Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1143 (10th Cir. 1074).

of the Sewer System which is currently in the hands of the County Commission – into the hands of a receiver.

Not all cases in which the issue of abstention is raised fit neatly into an existing abstention doctrine. *See Colorado River*, 424 U.S. at 816 (citing *Williams*, *supra*). In evaluating the abstention issue before it in *Colorado River*, the Supreme Court noted that the facts of that case did not fit neatly into any of the traditional abstention doctrines. In those circumstances, it stated "there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations" which are appropriate to consider, such as "considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River*, 424 U.S. at 816 (quoting *Kerotest Mfg. Co. V. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)).

Before it discusses the specifics of its analysis of whether it should abstain with respect to appointment of a receiver, it is appropriate that the court be clear about a few matters. First, it understands fully that "abstention ... is the exception, not the rule." *Colorado River*, 424 U.S. at 813. That having been said, "[a]bstention doctrines are a significant contribution of the theory of federalism and to the preservation of the federal system in practice. They allow federal courts to give appropriate and necessary recognition to the role and authority of the States." *Quackenbush*, 517 U.S. at 733 (Kennedy, J., concurring). Accordingly, "[t]he duty to take these considerations into account *must* inform the exercise of federal jurisdiction." *Id*. (emphasis added). One key issue here involves "a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the 'independence of state action,'" and an inquiry that focuses on whether "the State's interests are paramount [such] that a dispute would best be adjudicated in a state

44

forum." *Id*. at 728 (majority opinion) (citation and internal quotations omitted). "This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem, and retaining local control over difficult questions of sate law bearing on policy problems of substantial public import." *Id*. (citations and internal quotations omitted). With these principles in mind, the court will consider carefully whether it should abstain on the receiver issue. For the reasons explained below, it finds that this is not that close a case. In this diversity case, there is minimal federal interest[34] and the State of Alabama has a very strong interest in having complex questions of its state law decided by its courts – courts that are best equipped to decide them.

       1.     <u>The *Thibodaux* Abstention Doctrine Counsels In Favor of Abstention</u>

The court now turns to the question of *Thibodaux* abstention. In *Thibodaux,* the Supreme Court instructed that federal district courts should abstain from adjudicating matters before them where: (1) jurisdiction is predicated solely on diversity; (2) the case involves an unsettled question of state law; and (3) the subject matter of the unsettled question implicates important state interests. *Thibodaux*, 360 U.S. at 28-30. Stated a little differently, "[a]bstention is ... appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public

_____

[34]Plaintiffs may assert that a decision on Plaintiffs' Emergency Motion for the Appointment of a Receiver implicates important federal interests in that a failure to address Defendants' defaults under the Indentures (and enforce the contractually agreed-upon remedies) would have a negative effect on the entire national municipal bond industry. But such an argument would cut no ice at all. No *evidence* has been presented to the court suggesting that a failure to appoint a non-rate making receiver would have any effect on a federal interest. At most, based upon the information before the court, it may well be that decision in this case could have an effect on municipal bond market within the State of Alabama itself. However, even that conclusion is speculative based upon the lack of evidence now before the court.

45

import whose importance transcends the result in the case at bar." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976). Obviously, the first question the court must address is whether *Thibodaux* applies here. To be sure, Plaintiffs contend it does not. Their arguments on this issue are off the mark.

In *Thibodaux*, the Supreme Court upheld a district court's *sua sponte* decision to abstain from deciding a plaintiff's challenge to the City of Thibodaux's exercise of its eminent-domain power. *Id*. at 25-28. The district court determined that a pertinent state statue appeared in conflict with a Louisiana Attorney General's opinion and stayed the case pending the result of a declaratory judgment suit in Louisiana state courts (which at the time had not yet been filed).[35] *Id*. at 30. Reversing the Fifth Circuit, the Supreme Court held that "[t]he District Court was ... exercising a fair and well-considered judicial discretion in staying proceedings pending the institution of a declaratory judgment action and subsequent decision by the Supreme Court of Louisiana." *Id*. at 30. The Court emphasized that abstention "does not constitute abnegation of judicial duty," but rather is "a wise and productive discharge of it." *Id*. at 29.

The Supreme Court "has continued to cite *Thibodaux* approvingly." R. FALLON, ET AL., HART & WECHSLER'S THE FEDERAL COURTS & THE FEDERAL SYSTEM, at 1211 (5th ed. 2003) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), and *New Orleans Pub. Serv., Inc. v. New Orleans*, 491 U.S. 350 (1989)). So have lower federal courts. Writing for the *en banc* Fourth Circuit, for instance, Judge Widener described *Thibodaux* abstention this way: "[T]he *Thibodaux* abstention doctrine … is applied when there is no federal claim and there is a

---

[35]When it issued its opinion, the Supreme Court assumed that the parties would initiate the state-court suit after remand. *Thibodaux*, 360 U.S. 30-31.

significant and difficult question of state law that concerns matters which are particularly within the province of the state-sovereign to regulate or decide." *Pamponio v. Fauquier County Bd. of Supervisors*, 21 F.3d 1319, 1325 (4th Cir. 1994) (*en banc*), *overruled on other grounds by Quackenbush*, 517 U.S. 706.

Like other abstention doctrines, *Thibodaux* abstention is founded on principles of federalism. It is grounded in a healthy "regard for the respective competence of the state and federal court systems and for the maintenance of harmonious federal-state relations in a matter close to the political interests of a State." *Thibodaux*, 360 U.S. at 25. The *Thibodaux* Court found that eminent domain was "intimately involved with sovereign prerogative" of the city. *Id.* at 28.

Plaintiffs attempt to distinguish *Thibodaux* on three grounds. (Doc. #86 at 21). Each of those arguments misfire.

First, Plaintiffs emphasize the fact that *Thibodaux* itself involved "an uninterpreted state law with a directly conflicting Attorney General opinion." (*Id.*). Indeed that was an important aspect of that case, but the court is not aware of any decision or commentary that purports to limit *Thibodaux* or its rationale to those precise facts. Further, the conflict between the statue and the attorney general opinion was merely indicative of the "quandary" in which the *Thibodaux* district court found itself concerning the meaning of Louisiana law. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 30 (1959).

Second, and according to them "more importantly," Plaintiffs assert that *Thibodaux's* rationale applies *only* to cases involving eminent domain, which Plaintiffs call a "distinct purview of the state." (Doc. #86 at 21). That assertion is plainly in error. It cannot be argued that eminent

47

domain is more the "distinct purview of the state" than is the assignment and distribution (per the State's founding charter) of regulatory responsibility between state and local governments.[36]

Finally, Plaintiffs cite *Meredith v. Winter Haven*, 320 U.S. 228 (1943), and *McNeese v. Board of Education*, 373 U.S. 668 (1963), for the proposition that uncertainty in state law is not alone sufficient to justify *Thibodaux* abstention. But that argument is wide of the target also because it only gets Plaintiffs halfway home. *Thibodaux* itself acknowledged both *Meredith* and the uncontested proposition that Plaintiffs assert here – that uncertainty in state law alone is insufficient to trigger the application of *Thibodaux*. *See Thibodaux*, 360 U.S. at 24-25 & n.2. But *Meredith* and *McNeese* can be distinguished from *Thibodaux* – and this case – because the former cases did not involve uncertainty in an area that implicates important state interests. In *Thibodaux* and here, the

---

[36]Moreover, the Supreme Court's own cases make clear that eminent domain is *not* the controlling criterion in applying *Thibodaux* abstention. For example, in *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185 (1959), a case decided the same day as *Thibodaux*, the Court declined to require abstention in an eminent-domain case. Justice Stewart, one of only two Justices in the majority in both *Thibodaux* and *Mashuda*, explained the distinction:

> In *Mashuda* the Court holds that it was error for the District Court to dismiss the complaint. The court further holds in that case that, since the controlling state law is clear and only factual issues need be resolved, there is no occasion in the interest of justice to refrain from prompt adjudication.

*Thibodaux*, 360 U.S. at 31 (Stewart, J., concurring). In a later decision, the Supreme Court specifically reaffirmed both of the distinctions drawn by Justice Stewart, citing his *Thibodaux* concurrence for support. *See Quackenbush*, 517 U.S. at 717 (observing that *Thibodaux* applies in "cases raising issues intimately involved with the States' sovereign prerogative, the proper adjudication of which might be impaired by unsettled question of state law"); *id*. at 721 ("Unlike in *Thibodaux*, however, the District Court in [*Mashuda*] had not merely stayed adjudication of the federal action pending the resolution of an issue in state court, but rather had dismissed the federal action altogether. Based in large measure on this distinction, we reversed.") (punctuation, quotations, and citations omitted).

uncertainty related to important questions involving "the apportionment of governmental powers between City and State." *Id.* at 28. Just as *Thibodaux* involved the important state interest of the exercise of eminent domain, this case also clearly implicates important matters that are particularly within the province of the state-sovereign to regulate – namely, questions of Alabama law (including Alabama constitutional law) that address how Jefferson County's vested authority over its Sewer System relates to the sovereign prerogatives of the State.

Plaintiffs cannot dismiss *Thibodaux* either by pointing to factual distinctions that make no difference or by attempting to "creatively" limit its scope. Subsequent Supreme Court precedent makes clear that *Thibodaux* applies "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result of the case then at bar." *Colorado River*, 424 U.S. at 814.

As discussed above, jurisdiction in this matter is based solely on diversity so the real question becomes this – are there a number of *unsettled* questions of state law, which implicate important state interests that this court would be required to decide if it were not to abstain. The court finds that there are. By way of example only, and without limitation, if the court were to assume jurisdiction, it would be called upon to answer the following important questions that involve the State of Alabama's sovereign prerogative:[37]

1.  Can anyone other than Jefferson County's governing body set the County's sewer rates consistent with Amendment 73 to the Alabama Constitution?

2.  Can the County's seemingly exclusive ratemaking authority be contracted away?

---

[37]Some of these questions also implicate the Johnson Act's prohibition against a federal court (and in this case a federally appointed receiver) directly or indirectly affecting utility rates.

3.      Could a federally appointed receiver determine what rate is 'reasonable' by reference to existing Alabama law?

4.      Could a federally appointed receiver seek a determination of what are reasonable rates?

5.      Could a federally appointed receiver negotiate with others on behalf of the County regarding a solution to the current financial crisis?

6.      Could a federally appointed receiver lobby (on behalf of the County) the Alabama Legislature to pass legislation which would provide additional sewer revenue (*e.g.*, a sales tax that benefits the sewer system)?

7       What limits, if any, would a federally appointed receiver have in "manag[ing], operat[ing], control[ing], and administer[ing]" Jefferson County's sewer system?  *See* Amendment 73 to the Alabama Constitution.

8.      Does Alabama Code Section 6-5-20 require Plaintiffs to have presented their claims in equity for an appointment of a receiver to the County Commission prior to the filing of this suit?

A lengthy discussion about each of these questions is unnecessary.  However, by way of example, the court will address the last two questions in reverse order.

Alabama Code section 6-5-20 requires that "[a]n action must not be commenced against a county until the claim has been presented to the county commission, disallowed, or reduced by the commission and the reduction refused by the claimant." *Ala. Code* § 6-5-20.  Plaintiffs did not present this claim to the Jefferson County Commission prior to filing suit, but argue that presentment was not required under Alabama Code Section 11-28-6.  That section excuses presentment on claims based upon Warrants "in the aggregate amount of such warrants and the interest thereon, against such county and against any pledged funds pledged for the payment of the principal of and interest on such warrants, ..." *Ala. Code* § 11-28-6.

50

The complexity and significance of these issues, and the unsettled nature of Alabama law, is evident upon an examination of the parties' respective arguments. The County asserts that Plaintiffs have not raised the type of claims for which the statutory language excuses presentment because here they seek to enforce rights under the Trust Indenture governing the issuance of the Warrants. Specifically, they seek, *inter alia*, the appointment of a receiver and specific performance of the County's obligations under the indenture. Plaintiffs counter by arguing that the Warrants were issued pursuant to the Trust Indenture and certainly the County should have been on notice that potential plaintiffs would seek to enforce contractual remedies in the event of default.

There are no Alabama cases analyzing § 11-28-6, which Plaintiffs contend excuses their failure to present the claims in this case. There are numerous cases analyzing § 6-5-20. "The purpose of the requirement that the claim filed pursuant to § 6-5-20 be 'itemized' is ... 'to provide county governing bodies with notice of claims against the county and an opportunity to audit and investigate the claims ... .'" *Helms v. Barbour County*, 914 So.2d 825, 829 (Ala. 2005) (quoting *Elmore County Commission v. Ragona*, 540 So.2d 720, 723 (Ala. 1989)). Allowing Counties the opportunity to receive notice of claims and the opportunity to investigate those claims is an important state interest. Further, the itemization provision does not merely require vague notice of a potential claim. Rather, it should be read to require inclusion of "'a factual background, a description of the event or transaction giving rise to the claim, the alleged basis for the county's liability for damages resulting from the event or transaction, the nature of the damages, and the compensation demanded ... .'" *Helms*, 914 So.2d at 829 (quoting *Ragona*, 540 So.2d at 723). The dearth of authority on this issue convinces the court that the Alabama state courts should be given the opportunity to address this issue before a federal court sitting in diversity. This unsettled issue

51

of state law regarding a fundamental prerequisite to the entire lawsuit, which affects an important state interest, renders abstention appropriate under *Thibodaux*.

Another significant and complex question of state law presented here involves Amendment 73 to the Alabama Constitution.  Amendment 73 to the Alabama Constitution states:

> The governing body of Jefferson county shall have full power and authority to *manage, operate, control and administer* the sewers and plants herein provided for and, to that end, may make any reasonable and nondiscriminatory rules and regulations fixing rates and charges, providing for the payment, collection and enforcement thereof, and the protection of its property.

*Ala. Const*. Amend. 73 (emphasis added).  Plaintiffs seek the appointment of a receiver under the Indenture which provides that "[t]he Trustee shall be entitled ... with respect to an Event of Default, . . ., to the appointment of a receiver *to administer and operate* the System, ... ."  Indenture Section 13.2(c).  Thus, in the Indenture, the County promised that, in the event of a default,  Plaintiffs would be entitled to powers granted to the County under an Amendment to the Alabama Constitution. There are no state law cases analyzing or interpreting this provision of Amendment 73.

Plaintiffs argue that the vesting of the "full power and authority to manage, operate, control and administer the sewers" would include the authority to delegate that duty under contract and cite *City of Bessemer v. Bessemer Waterworks*, 152 Ala. 391, 44 So. 663 (Ala. 1907) for that proposition. Contrary to Plaintiffs' assertion, *City of Bessemer v. Bessemer Waterworks* is not directly on point, and does not clearly establish the County's "authority to delegate its power to a receiver."  In that case, the City did not delegate its duty to set rates, but rather contracted to an agreed upon maximum rate for a certain period of time.  That is, rather than delegating the authority to set rates, the City of Bessemer had input into the rates to be charged for that period of time.  They were just set by contract.  Thus, there exists another unsettled issue of state law, this time  regarding a constitutional

grant of power, which affects an important state interest.  Thus, *Thibodaux* counsels in favor of abstention with respect to this aspect of the case.

Plaintiffs also cite *Jefferson County Commission v. ECO Preservation Servs., LLC*, 788 So. 2d 121 (Ala. 2000), for the proposition that Amendment 73 does not give the County Commission "the *exclusive* right to maintain a sewer system in Jefferson County." (Doc. #74 at 17).  In *ECO*, the County Commission denied a permit to ECO to build its own private sewer that passed through Jefferson County.  *ECO*, 788 So. 2d at 123.  The issue was simply whether anyone other than Jefferson County itself could operate a sewer within the County's borders.  *Id*. at 127.  On that question, the Alabama Supreme Court held that Jefferson County's right to operate a system was not exclusive.  *Id.*  The Court thus allowed private parties to operate their own sewers, but it certainly did not hold – or even suggest – that private parties can set rates or otherwise interfere with the County Commission's exclusive control over *Jefferson County's public sewer*.  Plaintiffs can build their own sewer, to be sure.  But *ECO* says nothing about the issue before this Court: whether anyone other than the County Commission can *fix rates* for Jefferson County's sewer consistent with Amendment 73.

After carefully reviewing the record and the relevant case law, the court concludes that this question – like the issue of presentment under Section 6-5-20 – is not only complex and unsettled under Alabama law, but also implicates important and substantial sovereign-state issues.  Therefore, it is appropriate and advisable for the court to abstain from addressing it.

2.     Should the Remaining Claims Be Stayed?

Although *Thibodaux* dictates that this court should abstain from deciding whether Plaintiffs are entitled to the appointment of a receiver, that does not end this case.  In addition to seeking a

receiver, Plaintiffs have also sued for a breach of contract.  Furthermore, Defendants have asserted counterclaims of Negligence, Breach of Contract, and Fraud and Suppression which also remain pending.  Nevertheless, the court's decisions – that (1) it lacks jurisdiction to appoint a rate-making receiver and (2) should abstain from appointing a receiver without rate-making authority – raise a very practical concern.  Will continuing this case foster piecemeal litigation?  The Supreme Court has "held that federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,'" where denying a federal forum would clearly serve an important countervailing interest, ...  for example, '"wise judicial administration."'  *Quackenbush*, 517 U.S. at 716 (quoting *Colorado River*, 424 U.S. at 817 (quoting *Mashuda*, 360 U.S. at 189)).

The question remains whether in abstaining, the court should dismiss or merely stay the case.  The primary relief sought in this case is equitable in nature.  Where the relief sought is equitable in nature, dismissal is appropriate.  *Quackenbush*, 517 U.S. at 721.  However, in Count VII of the Complaint, Plaintiffs seek money damages for breach of the Standby Warrant Purchase Agreement, a remedy at law.  Further, in their Counterclaims, Defendants seek money damages.  "[W]hile [the Supreme Court has] held that federal courts may stay actions for damages based on abstention principles, [they] have not held that those principles support the outright dismissal or remand of damages actions."  *Id.*  Thus the appropriate course of action is for this court to stay this action and allow Plaintiffs the opportunity to seek review[38] of their claims in the Alabama state courts, which are not limited by the Johnson Act and would have the power to award them *all* of the relief they seek, if such court found it appropriate.  "[A]n order merely staying the action 'does not constitute

_____

[38]Given the circumstances of this case, as already indicated, if Plaintiffs desire, the court will work with the parties to examine whether an interlocutory appeal is appropriate now.

abnegation of judicial duty.  On the contrary, it is a wise and productive discharge of it. There is only postponement of decision for its best fruition.'" *Quackenbush*, 517 U.S. at 721 (quoting *Thibodaux*, 360 U.S. at 29).  Accordingly, the court requests that the parties confer and, within fourteen (14) days, file a joint report stating whether the court should: (1) stay this case, in whole or in part, so that they can litigate the issue of appointment or a receiver in state court; (2) allow the parties to continue to litigate the remaining issues in this court; or (3) discuss with the parties some other approach.

## IV.    Conclusion

For the reasons outlined above, the court finds (1) that the Johnson Act deprives it of jurisdiction to appoint a receiver with ratemaking authority, (2) abstention on the issue of whether to appoint a receiver without ratemaking authority is appropriate, and (3) the court has the discretion to stay the remaining aspects of the case in order to foster "wise judicial administration" and, if the parties so desire, avoid piecemeal litigation.

Within fourteen (14) days, the parties shall file with the clerk of the court a joint report stating whether they desire that the court: (1) stay the case, so that they can seek relief in a court that could provide full relief on all claims asserted; (2) continue to litigate the remaining issues in this court; or (3) discuss with the parties some other approach.  The court will enter a separate order once it receives a report from the parties.

**DONE** and **ORDERED** this ____12th____ day of June, 2009.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE